No.   95-298

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

---

IN THE MATTER OF THE CUSTODY AND
PARENTAL RIGHTS OF C.S.,

     Youth in Need of Care.

---

APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Jeffrey Sherlock, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

        Thomas S. Winsor; Winsor Law Firm,
Helena, Montana

     For Respondent:

        Hon. Joseph Mazurek, Attorney General,
Micheal S. Wellenstein, Ass't Attorney General,
Helena, Montana

        Mike McGrath, County Attorney; Carolyn A. Clemens,
Deputy County Attorney, Helena, Montana

        Randi M. Hood, Helena, Montana

---

Submitted on Briefs:  January 25, 1996

Decided:  April 12, 1996

Filed:

FILED

APR 1 2 1996

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1995 Internal Operating Rules, the following decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to State Reporter Publishing and West Publishing Companies.

The First Judicial District Court, Lewis and Clark County, terminated the parental rights of C.S.'s mother and father. The mother appeals. We affirm.

The issues are:

1. Did the court err in granting the State's petition for temporary investigative authority and protective services?

2. Was the mother prejudiced because a joint hearing was held concerning termination of both parents' rights?

3. Was the testimony of the foster parent prejudicial?

4. Did the District Court err in terminating the mother's parental rights?

C.S. was born in April 1993. Her mother, who was not married to or living with C.S.'s father, voluntarily placed C.S. in foster care for five days shortly thereafter while the mother was hospitalized. C.S. then returned to her mother's care.

Several weeks later, the Department of Family Services (DFS) filed for temporary investigative authority. The mother's parental rights to her first child, a daughter, had been terminated in 1985 as a result of sexual abuse, and DFS was concerned about possible recurrence of similar abuse. DFS had also been involved in the

2

mother's relinquishment for adoption of her second daughter, in 1989.

In June 1993, DFS and the mother entered a court-approved stipulation allowing DFS to develop a treatment plan and to place C.S. in foster care if DFS deemed it necessary. The mother then went to Tennessee with C.S. and C.S.'s father, without notifying DFS. Two months later, when the mother applied for food stamps in Great Falls, Montana, DFS became aware that she and C.S. had returned to the state. DFS removed C.S. from her mother's care, placed her in foster care, and asked the District Court for temporary custody and a declaration that C.S. was a youth in need of care. On August 30, 1993, DFS and the mother stipulated to those terms and that DFS should prepare a treatment plan.

In November and December 1994, the court held a hearing on termination of both parents' rights. DFS presented evidence that C.S.'s father had failed to comply with the terms of his treatment plan. DFS conceded that by the time of the hearing, the mother had complied with all terms of her treatment plan except one: a requirement that she arrange for suitable housing for herself and C.S. The court terminated both the mother's and the father's parental rights to C.S. The mother appeals.

I

Did the court err in granting the State's petition for temporary investigative authority and protective services?

In support of this claim, the mother argues that allegations that she sexually abused her oldest daughter were never proven.

She also complains that a consent form she signed while hospitalized shortly after C.S.'s birth, allowing C.S. to be put up for adoption if the mother died, represented an overstepping of bounds by DFS.

We will not put a district court in error for a ruling or procedure in which the appellant acquiesced or participated. In re Pedersen (1993), 261 Mont. 284, 287, 862 P.2d 411, 413. The mother stipulated to temporary investigative authority in June 1993, with advice of counsel. She cannot therefore now complain about the grounds on which that authority was granted. Further, neither the granting of temporary investigative authority nor the termination of the mother's parental rights was based upon an adoption consent form. We hold that the mother has not shown error in the granting of the petition for temporary investigative authority or violation of her rights during that process.

## Il

Was the mother prejudiced because a joint hearing was held concerning termination of both parents' rights?

The mother contends she was prejudiced by the joint hearing because her interests and those of C.S.'s father were hostile. She argues that the hostile positions of the parents served to enhance the case for termination of parental rights.

The mother first objected to the joint hearing on the day of the hearing. In denying her request for separate hearings, the court stated that it would sever the hearings if, during the hearing, problems arose. Several witnesses testified concerning

4

both parents. The mother does not refer to specific portions of the record in support of her allegations of prejudice. After reviewing the record, we conclude that the mother has not demonstrated grounds for reversal on this basis.

### III

Was the testimony of the foster parent prejudicial?

This argument is based on the foster father's testimony that his wife expressed a desire to adopt C.S. after C.S.'s first stay with the family for approximately five days shortly after her birth. The mother maintains that the only justification for introducing testimony regarding the potential adoption is that it would be in the best interests of the child, which she says is not the proper standard.

Again, we will not find error in a procedure in which the appellant acquiesced or participated. Peterson, 862 P.2d at 413. The mother's counsel elicited testimony from both the foster father and the DFS caseworker to the same effect as the testimony about which she now complains. We conclude that the objection made under this issue has been waived.

### IV

Did the District Court err in terminating the mother's parental rights?

Section 41-3-609(1)(c), MCA (1993), provides:

> (1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

(c) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.]

The State has the burden of proving by clear and convincing evidence that the statutory criteria under § 41-3-609(1)(c), MCA, have been met. Matter of S.C. (1994), 264 Mont. 24, 28, 869 P.2d 266, 268.

In the present case, a DFS caseworker testified that C.S.'s mother had not fully complied with the treatment plan objective that "[The mother] has suitable housing for she [sic] and [C.S.]. The Department will determine if housing is suitable." The caseworker testified that when the treatment plan was initiated, the mother, who has limited mental capability, was living with her own mother and brother. This was not viewed as suitable housing for the mother and C.S. because the mother's brother has sexually molested the mother in the past.

The caseworker testified that the mother rented a one-bedroom apartment several months prior to the hearing. Her fiance, whom she planned to marry in February 1994, had no residence of his own and often stayed with her there. The DFS caseworker and the fiance's mental health caseworker both testified that both the fiance and the mother had repeatedly been told that if he was to be a member of the mother's household, he must complete a parenting training class before she could regain custody of C.S. The fiance

6

had not undertaken parenting training, yet the mother allowed him to stay in her apartment.

The mother's caseworker testified that the mother's fifteen-month failure to obtain suitable housing for herself and c.s., combined with her long-term history of involvement with abusive male partners, made it unlikely that her failure to obtain suitable housing would change within a reasonable time.

As we have noted, in August of 1993, the mother stipulated to the court's declaration that C.S. was a youth in need of care. The record clearly supports **termination** of the mother's parental rights under § 41-3-609(1)(c), MCA. The District Court concluded that the mother had failed to complete her treatment plan by failing to obtain suitable housing for herself and C.S., and that her long history of involvement with DFS indicates that change will not occur in the near future.

The decision of the District Court is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____
Justices

7

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion. I conclude that as a matter of law there was insufficient evidence for state action as harsh as the termination of this mother's parental rights.

There was no evidence that C.S. had ever been abused. There was no evidence that she had ever been neglected.

C.S. was born on April 20, 1993. Shortly thereafter her mother had to return to the hospital for treatment of bleeding ulcers and agreed to the temporary placement of her daughter in foster care. On May 21, 1993, when C.S. was approximately one month old, the Department of Family Services petitioned for temporary investigative authority based solely on the fact that parental rights to a different child had been terminated in 1986 and that a second child had been relinquished for adoption in 1989. Significantly, there was no allegation that the daughter, who was the subject of these proceedings, had ever been neglected or mistreated in any way. The Department alleged that she was in danger of being abused based on unproven allegations that the mother had abused another daughter over eight years earlier.

The mother, whom the court ultimately found suffers from anxiety and has borderline intelligence, agreed to temporary investigative authority and later agreed to the treatment plan proposed by the Department of Family Services. The treatment plan required that she (1) undergo a sex offender appraisal, (2) complete a parent training course, (3) acquire suitable housing, (4) make weekly visits to her daughter while the daughter

8

remained in foster care, (5) avail herself of child health services, and (6) keep the Department of Family Services advised of any address changes.

When it was later learned that the mother kept frequent company with a male companion, an additional provision was added to the treatment program by the court that he also attend and complete the parent training course.

There was no description in the treatment plan of what constituted "suitable housing" for an unemployed single mother who was living on welfare. The plan simply provided that "[t]he Department will determine if housing is suitable."

In spite of the fact that she lived in poverty, C.S.'s mother found housing in which she and her daughter could live. However, the Department determined it was unsuitable because it had only one bedroom. Although the mother adequately complied with the treatment program in every other respect, the District Court terminated her parental rights based on its finding that she had not provided adequate housing and that her male companion had not completed parent training classes.

Based on the record, I conclude that C.S.'s mother did comply with her court-ordered treatment program in every possible respect, that the court had no authority to require that a nonparent enter into a treatment program, and that because of her compliance with her treatment program, the District Court was without authority to terminate her parental rights.

9

We have repeatedly held that parental rights involve a fundamental liberty interest and that a decree terminating such rights must be supported by clear and convincing evidence. In re *S.P.M.* (1994), 266 Mont. 269, 271, 880 P.2d 297, 298. In this case, before parental rights could be terminated the State had the burden of proving that: (1) C.S. had been adjudicated a youth in need of care; (2) an appropriate treatment plan had been approved by the court and not complied with by the parent; and (3) the conduct or condition that rendered this parent unfit was unlikely to change within a reasonable time. Section 41-3-609(1)(c), MCA.

Although C.S.'s mother stipulated to temporary investigative authority pursuant to § 41-3-402, MCA, the basis for the Department of Family Services' petition was questionable. However, assuming that the stipulation satisfied the first requirement of § 41-3-609(1)(c), MCA, the State still had the burden of proving by clear and convincing evidence that C.S.'s mother had not complied with her treatment plan. It was irrelevant whether her male companion complied with the treatment program. Section 41-3-609(1)(c)(i), MCA, refers only to a "parent's" failure to comply with the treatment program. It is doubtful that the District Court had any authority to even require that a nonparent enter into a treatment program based simply on his association with a parent, or that the parent could subsequently be penalized for the nonparent's failure to satisfactorily comply with that program.

C.S.'s mother did satisfactorily comply with the court-ordered treatment program. The only manner in which she arguably failed was the quality of her housing. However, it was only considered inadequate based on the absence of more than one bedroom, and even without more than one bedroom, the Department of Family Services conceded it was an adequate apartment had C.S.'s mother not had a male companion.

The frightening implication of the majority's decision is that something as fundamental as a parent's rights can be terminated based on that person's economic status or inability to provide a home that meets some middle class notion of suitability. Based on the standards applied in this case, most parents in the third world would be found unfit. The precedent set by this is case shocking.

For these reasons I dissent from the majority opinion.

_____
Justice

11

April 12, 1996

## CERTIFICATE OF SERVICE

I **hereby** certify that the following certified order was sent by United States mail, prepaid, to the following named:


THOMAS S. WINSOR
Wiisor Law Firm
P.O. Box 767
Helena, MT 59624

Mike McGrath, County Attorney
CAROLYN A. CLEMENS, Deputy
Lewis & Clark County
County Courthouse
Helena, MT 59601

J. MAYO ASHLEY
Attorney at Law
222 East Broadway
Helena, MT 59601

RAND1 M. HOOD
Lewis & Clark County
Courthouse
22.5 East Broadway
Helena, MT 59601

HON. JOSEPH MAZUREK, ATTORNEY GENERAL
Michael S. Wellenstein, Assistant
Justice Building
Helena, MT 59620


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy